SALAMANDRA INS. CO. v. NEW YORK LIFE INS. & TRUST CO.

(District Court, S. D. New York. December 16, 1918.)

1. INSURANCE ☞80—INSURANCE AGENTS—PREMIUMS.

Where a Russian fire insurance company, which did business in the United States, was represented by a German partnership, which in turn engaged local agents in the United States, *held*, that the local agents, who did not fully agree to a contract of agency submitted directly to them by the Russian fire company after relations with Germany were forbidden on account of the war, were not bound, under New York Insurance Law, § 38, to deposit to the credit of the Russian company com-

missions which had previously been paid to the German partnership, and which the agents themselves might be conditionally entitled to.

2. WAR ⊕⟹12—ENEMIES' PROPERTY—TRUST FUNDS—COMMINGLING PROPERTY.

The alien character of a fund is not divested because the custodian mixed it with other funds, which were unquestionably impressed with a trust for the benefit of American citizens.

3. WAR ⊕⟹11—TRADING WITH ENEMY—POWER OF CONGRESS.

Congress, by virtue of its war powers, has power to declare unlawful trading with enemy aliens, as it has done by Act Oct. 6, 1917 (Comp. St. 1918, §§ 3115½a–3115½j).

4. WAR ⊕⟹12—TRADING WITH ENEMY—POWER OF CONGRESS.

Under Trading with the Enemy Act Oct. 6, 1917, § 7, subd. (c), as amended by Act Nov. 4, 1918, § 1, the determination of the Alien Property Custodian, made in good faith, entitles him to the possession of alleged enemy property, and such possession will not be interfered with by injunction; the act providing methods for relief of those whose property was improperly taken.

5. CONSTITUTIONAL LAW ⊕⟹278(1)—DUE PROCESS OF LAW—TRADING WITH THE ENEMY ACT.

In view of Trading with the Enemy Act Oct. 6, 1917, § 9 (Comp. St. 1918, § 3115½e), such act is not invalid as violating Const. Amend. 5; there being no deprivation of the property of citizens, or friendly aliens, without due process of law.

6. WAR ⊕⟹12—TRADING WITH ENEMY—ARMISTICE.

Where the Alien Property Custodian determined funds were alien property, the signing of an armistice does not entitle adverse claimants to the fund, on the theory that the war had ceased, Trading with the Enemy Act Oct. 6, 1917 (Comp. St. 1918, §§ 3115½a–3115½j) itself declaring that the end of the war shall be deemed to mean the date of proclamation of exchange of ratifications of the treaty of peace, unless the President shall by proclamation declare a prior date; it appearing no such prior date has been declared.

7. WAR ⊕⟹12—TRADING WITH ENEMY—APPLICATION OF ACT.

Trading with the Enemy Act, § 9 (Comp. St. 1918, § 3115½e), providing a method for relief of any person claiming any interest, right, or title in any money or other property, etc., is extensive enough in its provisions to give relief to a claimant who asserted that it wholly owned, to the exclusion of all other persons, funds detained as alien property by the Alien Property Custodian, and hence such person is not entitled to equitable relief, etc.

In Equity. Suit by the Salamandra Insurance Company against the New York Life Insurance & Trust Company. On motion to make permanent pendente lite an injunction previously issued restraining the defendant from paying to A. Mitchell Palmer, as Alien Property Custodian, certain funds. Injunction heretofore granted, and bill, dismissed for want of equity.

Charles A. Towne, Leon O. Bailey, and William S. Thomson, all of New York City, for complainant.

Emmet & Parish, of New York City, for defendant.

Francis G. Caffey, U. S. Atty., of New York City (Earl B. Barnes, Asst. U. S. Atty., of New York City, and Lee C. Bradley, General Counsel to Alien Property Custodian, of counsel), amicus curiæ.

KNOX, District Judge. This is a motion to make permanent, pendente lite, the injunction issued herein upon November 4, 1918,

wherein the defendant was restrained from paying to A. Mitchell Palmer, as Alien Property Custodian, certain funds in the hands of the defendant, and for which funds the said custodian made formal demand upon the defendant upon October 15, 1918.

The complainant is a fire insurance company organized under the laws of Russia, and since 1899 has been engaged in the business of writing fire insurance within the United States. Pursuant to the provisions of the law of the state of New York, the complainant had deposited with the defendant cash and securities of the approximate value of $500,000. This sum has fluctuated in a manner dependent upon the amount of insurance from time to time in force and the losses sustained upon the risks of the complainant. At the present time the defendant, as trustee under a deed of trust executed by the complainant, holds the sum of about $4,072,787.89 in cash and securities for the purpose of securing the complainant's liabilities to its policy holders. The last-mentioned amount includes the sum of $115,013.19 which is the subject-matter of this litigation; said sum having been deposited with the said defendant in July, 1918.

Ever since the complainant engaged in business in the United States, and until October 29, 1916, the complainant was represented, by way of general agents, by the copartnership of H. Mutzenbecher, Jr., which copartnership it is admitted is a German concern, and consequently takes on the character of an enemy. This copartnership received by way of compensation for its services in the United States 3½ per cent. of the net premiums on business written in this country, which compensation was paid from Petrograd.

From 1899 to 1913 a local firm, in which William G. Willcox and William Y. Wemple were members, acted within the United States as agents of the complainant. This firm, however, received its compensation from the general agent of the company, viz. H. Mutzenbecher, Jr. In March, 1913, Meinel & Wemple, Incorporated, became the local agents of the complainant, and for its services received, by direct remittance from the Mutzenbecher firm, a commission of three-fourths of 1 per cent. of the net premium income of the complainant in the United States, together with the expenses incurred by Meinel & Wemple, Incorporated; the amount of said commissions being payable out of the sum of 3½ per cent. of said premiums earned by and paid to the firm of Mutzenbecher, Jr.

About October 29, 1916, the Russian government being then at war with the Imperial German government, there was promulgated at Petrograd an edict or ukase forbidding business relations between subjects of the Russian government and those of Germany, whereupon the complainant undertook to cancel the agency agreement of Mutzenbecher, Jr. Thereupon Meinel & Wemple, Incorporated, were forwarded an agency contract by the complainant, under which Meinel & Wemple, Incorporated, should, if the contract were accepted, become the complainant's agent and manager within the United States, and should, for its services, receive commissions of 3½ per cent. based upon the net premiums, which it will be borne in mind is the same rate of commissions formerly paid to Mutzenbecher, Jr.

This contract, which was accepted by Meinel & Wemple, Incorporated, also required that concern to do all the work formerly done by Mutzenbecher, Jr., and this involved, if the work was to be done, the purchase of insurance maps, the keeping of records, etc., formerly possessed and kept by Mutzenbecher, Jr. These consequent expenses, if incurred, would involve a considerable outlay.

Owing to the uncertainty of conditions in Russia, Meinel & Wemple, Incorporated, acted upon the theory that such expenditures were not presently necessary, and, having a contract which provided for additional services, endeavored to communicate with the home office of the complainant with a view of modifying the contract. While awaiting a response to these communications, Meinel & Wemple, Incorporated, deducted from the net premiums of the complainant 2½ per cent. thereof, and deposited said sum in the name of Meinel & Wemple, Incorporated, and from said account paid, monthly, to itself, three-fourths of 1 per cent. of said net premiums, together with the expenses incurred. In other words, Meinel & Wemple, Incorporated, received compensation at the same rate previously received by it during the life of the Mutzenbecher, Jr., agency; it being the expectation of Meinel & Wemple, Incorporated, that the balance of said commissions, calculated at the rate of 2½ per cent., should, after the deductions referred to, be permitted to accumulate, to the end that it might form a fund from which to purchase the equipment, etc., contemplated by the agency agreement between the complainant and Meinel & Wemple, Incorporated. This disposition, however, was contingent upon the approval of the complainant, which might request the payment of such balance to it.

In passing, it may be remarked that upon January 5, 1917, H. Mutzenbecher, Jr., cabled Meinel & Wemple, Incorporated, assenting to the execution by that concern of the American agency agreement. It is also asserted that since October 31, 1916, the German concern of Mutzenbecher has had nothing to do with the complainant's affairs, that said German firm has received, not only all the moneys to which it was entitled as of October 31, 1916, but in addition thereto an overpayment of $4,100.

No further word has been received from the complainant with respect to the Meinel & Wemple, Incorporated, contract, and the last-mentioned corporation has accordingly continued to represent the complainant, setting aside the said 2½ per cent., and deducting the said commission of three-fourths of 1 per cent. and expenses. The balance remaining constitutes the said sum of $115,013.19 which the Custodian demands as being enemy alien owned property.

The foregoing, in a general way, represents the situation as presented by the bill and the complainant's affidavits, and to the allegations so made there is nothing before me to show the contrary, saving and excepting the formal demand of the Custodian, wherein it appears that—

"I, A. Mitchell Palmer, Alien Property Custodian, * * * after investigation, do determine that the following money and other property * * * belong to and are by you held for, on account of, or for the benefit of H. Mutzenbecher, Jr., whose address is Hamburg, Germany, and whom, after

investigation, I determine to be an enemy, not holding a license granted by the President. * * * ''

It appears that in June, 1918, the Custodian, through one of his agents, began an investigation of the office of Meinel & Wemple, Incorporated, for the purpose of ascertaining if said corporation held any enemy owned funds or property. Upon the completion of the inquiry it was suggested that the fund of $115,013.19 had been set aside for H. Mutzenbecher, Jr., and that there was a secret agreement or understanding whereby the fund would be turned over to Mutzenbecher, Jr., at the end of the war.

Upon the expression of such conclusion, Meinel & Wemple, Incorporated, placed at the disposal of the Custodian all of its books and papers and the statements of its managing officers, and said corporation also notified the Custodian that it felt it its duty to the complainant to turn the fund in question into the account held by the defendant under the trust agreement hereinbefore referred to.

[1] No answer being received to this communication addressed to the Custodian, Meinel & Wemple, Incorporated, did deposit the fund with the defendant pursuant to the permissive terms of said trust agreement. It may be remarked that, so far as I am informed, the only provision of law which by any construction could require such disposition of the fund is section 38 of the Insurance Law of the state of New York (Consol. Laws, c. 28), which provides:

"Every person appointed or acting in this state as agent of any insurance corporation, who receives or collects any moneys as such agent, shall be responsible in a trust or fiduciary capacity to such corporation therefor."

It is my judgment that this provision of law did not make it incumbent upon Meinel & Wemple, Incorporated, to dispose of the fund in the manner in which it has been disposed of.

[2] I am also of opinion that, granting for the moment that the determination of the Alien Property Custodian is correct as to the alien character of the fund in question (which fact I do not find), such alien character is not divested by reason of the mixing of the fund with another fund which unquestionably is impressed with a trust for the benefit of American policyholders of the complainant. A voluntary and gratuitous increase of a trust fund will not be permitted to continue to the prejudice of a third party, when the fund is of such nature that the voluntary and gratuitous increase may be followed and segregated, all without the diminution or impairment of any security theretofore held for the benefit of the cestuis que trustent of the original fund. A tainted fund may not be given immunity from the penalties attaching thereto by an unlawful and unauthorized mixture with a fund enjoying immunities.

With the foregoing observations and the preliminary matters disposed of, I may proceed to determine if the injunction should be continued or vacated, and also whether the bill should be dismissed for want of equity.

[3, 4] Before doing so, it is only fair to Messrs. Willcox, Meinel, and Wemple, who are the managing officers of Meinel & Wemple,

Incorporated, to say that the conclusion which I shall reach must in no wise be taken as a reflection upon the integrity, loyalty, and honor of those men, or any of them. There is absolutely nothing before me which will serve to impeach their character even remotely; indeed, from the affidavits on file the conclusion is inevitable that they are men of high probity and unquestioned loyalty and devotion to this government, and the position they have assumed is altogether consistent with such conclusion. However, the Alien Property Custodian having determined that the fund in question is alien owned, and even though that conclusion may be founded upon evidence which would appear to this court to be insufficient, the determination of the Custodian, so long as it is not reached in bad faith, must determine the possession of the fund.

Subsection (c) of section 7 of the Trading with the Enemy Act, approved October 6, 1917 (40 Stat. 416, c. 106), reads:

"If the President shall so require, any money or other property owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of an enemy or ally of enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing or so belongs or is so held, shall be conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian."

Upon November 4, 1918 (chapter 201, § 1), two days after the filing of the bill herein, the above section was amended to read as follows:

"(c) If the President shall so require any money or other property including (but not thereby limiting the generality of the above) patents, copyrights, applications therefor, and rights to apply for the same, trade-marks, choses in action, and rights and claims of every character and description owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of, an enemy or ally of enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing or so belongs or is so held, shall be conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or the same may be seized by the Alien Property Custodian; and all property thus acquired shall be held, administered and disposed of as elsewhere provided in this act.

"Any requirement made pursuant to this act, or a duly certified copy thereof, may be filed, registered, or recorded in any office for the filing, registering, or recording of conveyances, transfers, or assignments of any such property or rights as may be covered by such requirement (including the proper office for filing, registering, or recording conveyances, transfers, or assignments of patents, copyrights, trade-marks, or any rights therein or any other rights); and if so filed, registered, or recorded shall impart the same notice and have the same force and effect as a duly executed conveyance, transfer, or assignment to the Alien Property Custodian so filed, registered, or recorded.

"Whenever any such property shall consist of shares of stock or other beneficial interest in any corporation, association, or company or trust, it shall be the duty of the corporation, association, or company or trustee or trustees issuing such shares or any certificates or other instruments representing the same or any other beneficial interest to cancel upon its, his, or their books all shares of stock or other beneficial interest standing upon its, his, or their books in the name of any person or persons, or held for, on account of, or on behalf of, or for the benefit of any person or persons who shall have been determined by the President, after investigation, to be an enemy or ally of enemy, and which shall have been required to be conveyed, transferred, assigned, or delivered to the Alien Property Custodian or seized by him, and in

lieu thereof to issue certificates or other instruments for such shares or other beneficial interest to the Alien Property Custodian or otherwise, as the Alien Property Custodian shall require.

"The sole relief and remedy of any person having any claim to any money or other property heretofore or hereafter conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or required so to be, or seized by him shall be that provided by the terms of this Act, and in the event of sale or other disposition of such property by the Alien Property Custodian, shall be limited to and enforced against the net proceeds received therefrom and held by the Alien Property Custodian or by the Treasurer of the United States."

As to the power of Congress to address itself to legislation looking to the seizure of alien enemy owned property, there is no need of discussion. The war legislation of Congress, from the time of the Revolution to the present, indicates the power of Congress in the premises.

I am unable to see any difference in principle between the seizure of the person of an alien enemy in our midst and the seizure of his property; the latter may, by the use to which it may be put, be quite as dangerous as the former. The seizure of both may be essential to the safety of the community. If we assume this to be true, and Congress has by appropriate action provided for such contingency, the haste and speed which are exercised in the seizure become of the highest importance, and it would be an incongruous situation—indeed, it would be intolerable—that, pending a determination of a dispute between the possessor of property determined by a responsible official to be alien owned and the officer making the demand, the property in question should remain in the possession of him against whom the demand is made. The effectiveness of a seizure in such circumstances would be greatly impaired, if not wholly destroyed.

I do not apprehend that any one would argue that this court should exercise its extraordinary powers of injunction to restrain the marshal from executing a presidential warrant issued for the arrest of an alleged alien enemy, even though it was asserted by such person that he was a citizen or a friendly alien. Once the warrant was executed, the person arrested would, upon habeas corpus, be heard upon the question of his citizenship. If the determination of the Executive can, in the first instance, deprive an individual of his liberty, I am unable to see why it should be that property should enjoy any greater rights as respects its possession, once the Executive has determined it to be alien owned. And in the above illustrations I do not believe it could fairly be said there was not due process of law merely because the arrested individual was not heard prior to his arrest.

The power exercised by Congress in the enactment of the Trading with the Enemy Act (Act Oct. 6, 1917, c. 106, 40 Stat. 411 [Comp. St. 1918, §§ 3115½a–3115½j]) is, I suppose, by reason of its dealing with the subject-matter of alien enemies, who exist only in times of war, based upon the war power of Congress. The power of Congress to declare war carries with it all the powers which are necessary to make the war so declared effective. In McCulloch v. Maryland. 4 Wheat. 316, 4 L. Ed. 579, Chief Justice Marshall said:

"Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional."

That case also declares that—

"Where the law is not prohibited, and is really calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. This court," it was said, "disclaims all pretensions to such a power."

What, can it be asked, is, in the present days, more appropriate to the effective carrying on of war than to seize, and thus render impotent, the money and property determined by the Executive to be owned by alien enemies?

In Brown v. United States, 8 Cranch, 110, 3 L. Ed. 504, Chief Justice Marshall in unequivocal language declared the existence of the power of the sovereign to take the persons and confiscate the property of the enemy wherever found. It follows that wherever the enemy is present, and where his property is situate, Congress may determine there exists the element of danger, and to the extent of the jurisdiction of Congress the power exists, not only of seizure, but of disposition to the limits of the necessity. Miller v. United States, 11 Wall. 268, 20 L. Ed. 135.

[5] And in the present legislation, at least so far as it affects the case at bar, there is no contravention of the Fifth Amendment of the Constitution. The very act, in section 9 thereof (Comp. St. 1918, § 3115½e), contemplates the possibility of mistaken action upon the part of the Custodian, and to the end that no loyal citizen or friend shall be deprived of his property without due process of law the section reads:

"Sec. 9. That any person, not an enemy, or ally of enemy, claiming any interest, right or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian hereunder, and held by him or by the Treasurer of the United States, or to whom any debt may be owing from an enemy, or ally of enemy, whose property or any part thereof shall have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian hereunder, and held by him or by the Treasurer of the United States, may file with the said Custodian a notice of his claim under oath and in such form and containing such particulars as the said custodian shall require; and the President, if application is made therefor by the claimant, may, with the assent of the owner of said property and of all persons claiming any right, title, or interest therein, order the payment, conveyance, transfer, assignment or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or of the interest therein to which the President shall determine said claimant is entitled: Provided, that no such order by the President shall bar any person from the prosecution of any suit at law or in equity against the claimant to establish any right, title or interest which he may have in such money or other property. If the President shall not so order within sixty days after the filing of such application, or if the claimant shall have filed the notice as above required and shall have made no application to the President, said claimant may, at any time before the expiration of six months after the end of the war, institute a suit in equity in the District Court of the United States for the district in which such claimant resides, or, if a corporation, where it has its principal

place of business (to which suit the Alien Property Custodian or the Treasurer of the United States, as the case may be, shall be made a party defendant), to establish the interest, right, title, or debt so claimed, and if suit shall be so instituted then the money or other property of the enemy, or ally of enemy, against whom such interest, right, or title is asserted, or debt claimed, shall be retained in the custody of the Alien Property Custodian, or in the Treasury of the United States, as provided in this act, and until any final judgment or decree which shall be entered in favor of the claimant shall be fully satisfied by payment or conveyance, transfer, assignment, or delivery by the defendant or by the Alien Property Custodian or Treasurer of the United States on order of the court, or until final judgment or decree shall be entered against the claimant, or suit otherwise terminated.

"Except as herein provided, the money or other property conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian shall not be liable to lien, attachment, garnishment, trustee process, or execution, or subject to any order or decree of any court.

"This section shall not apply, however, to money paid to the Alien Property Custodian under section 10 hereof."

Under the provisions of this section the rights of a person who is not an enemy or ally of enemy are adequately protected. If the property which has come into the hands of the Custodian belongs to a citizen of the United States, or indeed to a friendly alien, the title of such person thereto is not finally divested. Any title which vests in the Custodian will be defeasible in its nature. Whether the defeasance, if it may be called such, shall operate, will depend upon the outcome of the proceedings to be instituted by the citizen or friendly alien, who, in appropriate proceedings under section 9, asserts title to the property. Pending a determination of the issues arising in such proceedings, the possession at least, and perhaps a defeasible title, is in the Custodian, and as an administrative matter I do not see where else it could be, if the act is to have any salutary effect in the way of rendering enemy property unavailable for the purposes of the enemy.

That a citizen or friendly alien will, by such an enforced surrender of property wrongly determined by the Custodian to be enemy in its character, be subjected to inconvenience, annoyance, and possible expense, goes without saying—the justification for these considerations must be the purpose intended to be served. They are, in the final analysis, but incidents to the operation of a protective and preventive measure which has for its purpose the protection of the nation.

The situation presented by this case, assuming the contention of the complainant to be justified, is no more rigorous, I may say harsh, than it would be if the taxing authorities of the government should assess a tax against the complainant, the authority for which assessment the complainant disputed. The collector, for instance, of internal revenue, would issue a warrant, under which the chattels of the complainant would be distrained and pass into the hands of the collector, and the complainant, however just its claim for immunity from the tax so assessed and collected might be, nevertheless, in order to recover the chattels distrained, would be forced to bring suit against the collector, and thus subject itself to inconvenience, annoyance, and expense. However, by decisions too numerous to cite the courts have uniformly held that the revenues of the government are too im-

portant for the carrying on of governmental activity to permit, prior to the collection of the tax, of lawsuits in which the correctness of the construction of the tax gatherer of the provisions of the statute under which he acts is determined. The insolvency of the sovereign is unthinkable. Money wrongly collected may be recovered, and as a matter of policy the interests of the government in such matters take precedence over the rights of the citizen. If this be true, even in times of peace, it certainly should be true, and I think it is, in time of war, when the subject-matter is property asserted by a responsible government officer to be that of an enemy. As was said in the Legal Tender Cases, 12 Wall. 457, 551 (20 L. Ed. 287), with respect to the Fifth Amendment of the Constitution:

"That provision has always been understood as referring only to a direct appropriation. and not to consequential injuries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon, or to inhibit, laws that indirectly work harm and loss to individuals. A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses—may, indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff could not be changed, or a nonintercourse act or an embargo be enacted, or a war be declared?"

It was said upon the argument that the Custodian now holds in property or money determined by him to be enemy owned upwards of three-quarters of a billion dollars. The power of this fund in the hands of enemies might be stupendous, so far as its ability to work injury to the country is concerned. Suppose that, upon the seizure of this vast sum, objections had been interposed by citizens or friendly aliens upon the ground that they claimed title to the whole or part thereof. · It seems to me that it is inconceivable that the claimants of such property should during the trial and appeal be permitted to remain in possession of the funds and property.

[6] It is urged upon me that I should not now uphold the authority of the Custodian, even if such authority exists, to have the possession of the fund, owing to the fact that an armistice with the enemy has been signed and is now in effect, and the declaration of the President, when he addressed Congress upon November 11, 1918, to the effect that "the war thus comes to an end," indicates that the necessity of the legislative enactment is past. With this I cannot agree. At this moment the armed forces of the government are occupying the territory of the enemy; they are there not as friends, but as an army of occupation, to enforce and make secure the terms of the armistice pending the negotiations for peace; and the very act provides that "the end of the war," as used in the act, "shall be deemed to mean the date of proclamation of exchange of ratifications of the treaty of peace, unless the President shall, by proclamation, declare a prior date, in which case the date so proclaimed shall be deemed to be 'the end of the war' within the meaning of this act." Such proclamation has not been made. Until it shall be made, or until Congress repeals or modifies the statute in question, judicial tribunals will question neither the authority nor the necessity of the act, provided it does not transgress the provisions of the Constitution. Political pol-

icies, and the wisdom thereof, are not within the purview of my jurisdiction.

[7] It is urged upon me that the fund being, as it is asserted by the complainant, wholly owned by it to the exclusion of the property interests of all other persons, the complainant is not and cannot be a person "claiming any interest, right or title in any money or other property." In other words, it is said section 9 is available only to persons who claim in the property seized something less than the entire title thereto. With this contention I cannot agree. In my judgment an interest in property may comprehend the entire title thereto as well as something less than the entire title. If a man owns the fee simple of certain real estate, he certainly has an interest in it, and that interest is the equivalent of his title "to" the property.

I have already gone beyond the limits of propriety in the length of my discussion of the matters here involved, and, interesting and important as are the remaining points raised by the able arguments and briefs of which I have had the benefit, I must bring this opinion to an end. It will therefore be the order of the court that the injunction heretofore granted herein will be vacated, and the bill filed herein will be dismissed for want of equity. There can be no equity in the complainant until the fund in question has passed into the possession of the Custodian, and the complainant has taken the jurisdictional steps provided in section 9 of the act.

Submit order in accordance with the foregoing opinion.