Campbell, Chief Justice,
delivered the opinion of the court:
This case is before the court upon the defendant’s demurrer to the petition, which in substance avers: Plaintiff is a corporation organized and existing under the laws of Germany, and is a citizen of Germany, and at the times mentioned in the petition was engaged in the business of operating steamships, of which it was the owner of many, its prin *451 cipal office and place of business being at Hamburg, Germany. In or about the month of May or June, 1911, pursuant to authority granted by the joint resolution of May 12, 1917 (hereinafter set forth), the President of the United States “ took over to the United States the immediate possession and control ” of the plaintiff’s steamers which then were within the jurisdiction of the United States or its insular possessions and which were the sole and exclusive, property of plaintiff and in its possession. ’The names of the six steamers and the alleged fair and reasonable value of each is stated, and the aggregate value was $9,022,000.
Also it is alleged that certain stores and equipment belonging to the several steamers were also taken over, and that by the taking over of the possession and control of the steamers in the manner stated, and “ thus appropriating the said steamers to its own use, enjoyment, and benefit,” the United States impliedly agreed with plaintiff to pay plaintiff the fair and reasonable value of said steamers, and also for their stores and equipment, but that they have wholly failed and refused to pay the same. It is further averred that the survey required by section 2 of the joint resolution has been duly made and report thereof filed with the Secretary of the Navy. The claim is for the alleged aggregate value of the steamers besides the value of their coal, stores and equipment. xV. further claim of $10 per dead-weight ton per month for each steamer as the value of its use is made in the petition, but the plaintiff abandoned this claim, insisting, however, upon the alleged value of its property. It was explained in argument that the several steamers, with the exception of those in Cuban harbors, were all in American harbors at the outbreak of the war. They were merchant vessels which had sought asylum in these harbors and were left unmolested until the United States entered the war. There were fifteen other suits involving vessels of the alleged aggregate value of over $30,000,000 submitted with this one, besides a large number of similar cases heard at the same time.
On April G, 1917, the Congress adopted the joint resolution declaring the existence of a state of war between the United States and the Imperial Government of Germany, *452 On that day some of the vessels in question were taken into possession and control by agents of the United States Government. On May 12, 1917, the Congress adopted a joint resolution as follows : '
“ Char. 13. Joint resolution authorizing the President to take over for the United States the possession and title of any vessel within its jurisdiction, which at the time of coming therein was owned in whole or in part by any corporation, citizen, or subject of any nation with which the United States may be at war, or was under register of any such nation, and for other purposes.
“Resolved by the Senate and Houpe of Representatives of the United States of America in Congress assembled, That the President be, and he is hereby, authorized to take over to the United States the immediate possession and title of any vessel within the jurisdiction thereof, including the Canal Zone and all territories and insular possessions of the United States except the American Virgin Islands, which at the time of coming into such jurisdiction was owned in whole or in part by any corporation, citizen, or subject of any nation with which the United States may be at Avar when such vessel shall be taken, or Avas flying the flag of or was under register of any such nation or any political .subdivision or municipality thereof; and through the United States Shipping Board, or any department or agency of the Government, to operate, lease, charter, and equip such vessel in any seiwico of the United States, or in any commerce, foreign or coastwise.
“ Sec. 2. That the Secretary of the Navy be, and he is hereby, authorized and directed to appoint, subject to the approval of the President, a board of survey, Avliose duty it shall be to ascertain the actual value of the vessel, its equipment, appurtenances, and all property contained therein, at the time of its taking, and to make a Avritten report of their findings to the Secretary of the Navy, who shall preserve such report with the records of his department. These findings shall be considered as competent eA’idence in all proceedings on any claim for compensation.” (40 Stat. 75.)
By proclamation dated June 30, 1917, AA'hich incorporated the joint resolution of May 12 and mentioned by name 69 German ships, it AA-as ordered by the President that “ through, the United States Shipping Board there be taken oA’er to the United States the possession and title of the aforementioned vessels. The United States Shipping Board is further hereby authorized to repair, equip, and man the said vessels; to operate, lease, or charter the same in any seiwice of the United States or in any commerce, foreign or coastwise; and to do and perform any and all things that may be neces *453 sary to accomplish the purposes of the joint resolution aboye set forth.”
A question presented at the threshold is whether the Court of Claims has jurisdiction in the premises. The plaintiff contends that the allegations bring its case within the scope of section 145, Judicial Code, conferring power to hear and determine claims founded upon the Constitution or any law of Congress, or upon implied contract with the United States. The action is not founded upon the Constitution or a law of Congress. The joint resolution authorized the President to take title to the vessels and he did so. It does not in terms declare a liability of the Government or of itself create a right in plaintiff. It was said by Judge Richardson in Ludington’s case, 15 C. Cls. 453, that to sustain a claim as one founded on a law of Congress there must be “ a statute liability on the part of the Government.” See Hukill case, 16 C. Cls. 562. In Hvoslef case, 237 U. S. 1, 11, the statute authorized and directed the payment of certain claims. The act construed in the Medbury case, 173 U. S. 492, created the right to payment.
Where suits for compensation have been, maintained because of the taking by the Government of private property for public use they were not founded upon the Constitution or the Fifth Amendment or a law of Congress, but upon an implied contract arising out of the circumstances of the taking. In United States v. Great Falls Mfg. Go., 112 U. S. 645, one of the earliest cases on the subject, the principle was announced, and it has been repeatedly reaffirmed. In United States v. North American Transportation & Trading Co., 253 U. S. 330, 335, it was said: “ The right to bring this suit against the United States in the Court of Claims is not founded upon the Fifth Amendment, but upon the existence of an implied contract entered into by the United States.” See Tempel case, 248 U. S. 121, 129; Peabody case, 231 U. S. 530, 539; Klebe case, 57 C. Cls., 160; 263 U. S. 188. The circumstances of the case may rebut the implication of such a contract. Horstmann case, 257 U. S. 138, 146; Ball Engineering Co. v. White & Co.. 250 U S. 46, 57; Klebe Case, supra.
*454 It was the action taken in virtue of the joint resolution that deprived plaintiff' of its property, and the question is whether the circumstances gave rise to the implication of a contract of Avhich the Court of Claims has jurisdiction. Manifestly the joint resolution Avas an exercise of the Avar poAver of Congress. It finds support in the constitutional proAnsion that empoAA'ers Congress to declare war and to make rules concerning captures on land and Avater. Art. 1, § 8, cl. 11. See Stoehr v. Wallace, 255 U. S. 239, 242; Commercial Trust Co. v. Miller, 262 U. S. 51; Brown v. United States, 8 Cranch 110, 126; Miller v. United States, 11 Wall. 268, 305; Fischer v. Palmer, 259 Fed. 355. Salamandra Ins. Co. v. New York Life Ins. Co., 254 Fed. 852. Several of these cases deal Avith the trading with the enemy act, but that act granted broad poAvers to the Alien Property Custodian in dealing AAÚth enemy property, and if the property inAmh^ed in this and similar suits had not been taken, as it Avas, it could admittedly haAre been taken by the Alien Property Custodian, in Avhich event there would haA^e been no jurisdiction in this court.
In Brown v. United States, 8 Cranch 110, the Circuit Court had condemned certain pine lumber seized as enemy property. The court’s action Avas sought to be sustained upon the mere fact of the declaration of Avar. This the Supreme Court said Avas not sufficient, but that legislative action -was essential to confer upon courts authority to condemn enemy property. Chief Justice Marshall said, page 122: “ That Avar gives to the soA’ereign full right to take the persons and confiscate the property of the enemy wherever found, is conceded. The mitigations of this rigid rule, Avhich the humane and wise policy of modern times has introduced into practice, aauII more or less affect the exercise of this right, but can not impair the right itself. That remains undiminished, and when the soArereign authority shall choose to bring it into operation, the judicial department must give effect to its AArill. Brit until that Avill shall be expressed, no poAver of condemnation can exist in the court.” The court could not pronounce a sentence of condemnation in the absence of legislative authority so to do. In the instant case the court is asked to order compensation for enemy property *455 seized by authority of a legislative act that is silent on the question of jurisdiction. As already stated, the taking of private property for public use by the Government, and for which the Fifth Amendment requires compensation to be made, falls within the class of claims founded upon implied contract, and the duty imposed by this amendment is an essential element in raising the necessary implication of an agreement to pay.
But the limitations or restrictions of the Fifth Amendment do not affect the exercise of the war power conferred upon Congress when enemy property is taken. It was said in Miller v. United States, 11 Wall. 268, 304, that where the statutes were “ an exercise of the war powers of the Government, it is clear they are not affected by the restrictions imposed by the Fifth and Sixth Amendments.” (See Herrera case, 222 U. S. 558, 512.) It was added: “The Constitution confers upon Congress expressly power to declare war, grant letters of marque and reprisal, and make rules respecting captures on land and water. Upon the exercise of these powers no restrictions are imposed. Of course the power to declare war involves the power to prosecute it by all means and in any manner in which war may be legitimately prosecuted. It therefore includes the right to seize and confiscate all property of an enemy and to dispose of it at the will of the captor. This is and always has been an undoubted belligerent right.” See Morrisdale Coal Co. Case, 55 C. Cls., 310, 315; Salamandra Ins. Co. v. New York Life Ins. Co., 254 Fed. 852, 858; Fischer v. Palmer, 259 Fed. 355, 358.
In Green's case, 10 C. Cls. 466, the facts were that the plaintiff, a citizen of the United States, was domiciled in Nashville, Tennessee. On the 16th day of February, 1862, while the capture of Nashville by the United States Army was imminent and expected, plaintiff went south with a large amount of his firm’s moneys, which he took for investment. “ While absent from his residence, he was not engaged in giving aid or encouragement to the rebellion, other than such as might arise from his voluntarily leaving his domicile and remaining within the Confederate lines and having commercial dealings with the people.” When he *456 left Nashville he was the owner of certain rent-producing buildings occupied by tenants and left in charge of his agent. The agent continued to collect the rents and care for the buildings until December, 1864, when they were seized by the special supervising agent of the Treasury as. abandoned property, who collected the rents until July 8,, 1865. The suit brought in October, 1870, was to recover these rents. The authority for taking the property was the act of July 2, 1864, 13 Stat. 375, which did not in terms prescribe a remedy. The opinion of the court, delivered by Judge Nott, says that “ the case presents, with unusual clearness, the question whether the Government is judicially liable for any of the war measures resorted to in the late rebellion other than the liability created by the abandoned or captured property act,” and states the question to be whether the Government is liable for the acts of its officers, done under color of its authority within the insurrectionary district, where the party injured was loyal and the circumstances were such as would give a citizen in túne of peace a right of action against the Government under the mandate of the Constitution that private property should not be taken for public use without just compensation. Declaring that it made no difference in the applicable rule whether the property was taken by the Army or the Navy, or by an officer of the Treasury, the court concluded that the Government Avas not liable upon implied contract. The court said (p. 471) : “It is inevitable that a war must be prosecuted rigorously, and it is desirable that it be prosecuted as little to the injury of a government’s own citizens as possible. In the prosecution of a war the discretion of a government, so far as the enemy is concerned, takes the place of ordinary constitutional restrictions or statutory provisions.”
To relieve the rigor of the situation, the act of March 12, 1863, commonly called the abandoned or captured property act, was enacted. It was a beneficent piece of legislation, and, speaking of it, the court say in Klein's case, 13 Wall.. 128, 138: “ There is, so far as Ave are aware, no similar legislation mentioned in history.” It created a right where none *457 existed before, Anderson case, 9 Wall. 56, and authorized suits under specified conditions for the proceeds of sales of property that had been taken or seized as “ enemy property.” Although it Avas recognized, as was said in Lamar v. Brown, 92 U. S. 187, 195, that the United States, during the Civií War, occupied the position of “both belligerent and constitutional sovereign,” it was also recognized, and uniformly held, that it was only in virtue of the act mentioned that even the loyal citizen, whether he resided in the one or the other of the sections, could assert in the Court of Claims compensation for his property that had been seized or' appropriated as enemy property. The theory of an implied contract arising out of such seizure or appropriation finds no support in the decided cases. In Young's ease, 97 U. S. 39, 67, it was said of the British subject, in whose right the suit was brought: “ Collie has been deprived of no right he ever had. Neither he nor any one similarly situated has ever been permitted to sue the United States in their own courts upon such a claim.” See Klein case, 13 Wall. 128, 137; Moore case, 10 C. Cls. 375, 383; Haycraft case, 22 Wall. 81, 92; Hijo case, 194 U. S. 315.
In the Herrera ease, 43 C. Cls. 430, the plaintiff insisted that there was an implied contract, but this court held it had not jurisdiction under the Tucker Act, and quoted from the Hijo case, 194 U. S. 315, 320, where it is said: “The vessel was therefore to be deemed enemy’s property. It was seized as property of that kind, for purposes of Avar and not for any purposes of gain.” The judgment Avas affirmed by the Supreme Court. In the course of their opinion, reference is made to the modern rules of Avar, stated by Kent (1 Kent, 92, 93), and AAdiich are in substance urged here, and the opinion proceeds: “If the record presented such a case, the question could be raised Avhether it presented one for judicial cognizance, even if a court could share the indignation Avhich the learned commentator says all mankind would feel. It is certain that the court’s power can not be enlarged by its emotions.” Herrera case, 222 U. S. 558, 572.
The second section of the resolution directed that a survey be made, the results of AAdiich should be competent *458 evidence in any proceedings for compensation. This provision is entirely consistent with the idea that Congress intended to reserve for future determination any question of compensation. It falls short of conferring power upon this court to determine it. It is significant when the policy of legislation during the war is considered that provision was made for action against the Government in all cases where it was intended to confer the right. Notwithstanding this court had the power to hear and determine suits against the Government conferred by section 145 of the Judicial Code, the numerous statutes authorizing requisitions and the taking of private property expressly designated the court where suits could be brought. Some of these conferred jurisdiction on the Court of Claims; some on District courts, and some on both of these courts. Mr. Justice Brandéis, in the Pfitsch case, 256 U. S. 547, 552, says: “A survey of the' Avar legislation permitting the seizure of property discloses that Congress has established three distinct jurisdictions for the purpose of suit against the United States for compensation.” He mentions 25 different instances.. The Government can not be sued without its consent, and the power to hear and determine suits against the United States should not and does not rest in mere inference or implication. It was said in Saycraffs case, 22 Wall. 81, 92: “A sovereign can not be sued in his oAvn courts except with his consent. This is an action against the United States in its own Court of Claims. The appellant must, therefore, show that consent has been given to its prosecution.” Every court must take notice of the limits of its jurisdiction. Reid case, 211 U. S. 529. It Avas suggested in argument in some of this class of cases that the Government took charge of the railroads under provisions of the national defense act, Avhich did not prescribe a method for ascertaining compensation. But this action taken in an emergency was followed by a statute, AAdiich provided the necessary forum. The trading with the enemy act authorizing the Alien Property Custodian to take over and to dispose of enemy property did not permit suits by the enemy owners. Nor does the joint resolution of May *459 12 authorize suits by the German owners of the vessels. If this resolution can be made the basis of the suits they could have been instituted as soon as the President took action under it. Can it be supposed that the Government intended to- open its courts to enemies seeking compensation for property taken from them while the Avar was yet flagrant? The history of the enactment rebuts any such idea. A joint resolution was introduced and referred in the Senate and in the Plouse. As reported to the Senate by its committee, the joint resolution contained 'flve sections. (Cong. Rec., vol. 55, pt. 2, p. 1512.) The first two sections contained all that was finally adopted. The three other sections purported to authorize suits to be brought by parties interested in the vessels and had provisions relative to suits. By ■ section 5 the suits could be brought in the Court of Claims. All of sections 3, 4, and 5 thus reported v?ere stricken out by amendment in the Senate. (Cong. Rec., Arol. 55, pt. 2, p. 1575.) An amendment proposed by Senator Knox authorizing the President tó “requisition” the vessels was A^oted down. (Cong. Rec., vol. 55, pt. 2, pp. 1575, 1576.) The joint resolution as amended was adopted by the Senate, and in that shape was sent to the House, where it was taken up, superseding the one on its calendar, and passed as it came from the Senate. This definite action by the Senate, concurred in by the House, confirms the Anew that there was no intention to authorize suits in the Court of Claims on account of the seizure of these Aressels. See Pfitsoh case, supra.
The plaintiff argues that the United States did not confiscate or intend to confiscate the property and that the taking must consequently be referred to the poAver of eminent domain with a duty to make compensation. What we have said sufficiently answers this contention. We do not think it necessary to assert that there was a confiscation, nor to deny that the Congress may have intended that the United States would at some time account for the Aressels or their ascertained value. If this court is without jurisdiction, its conclusions upon these questions would probably *460 be comm non judice. The result, however, in this case, would not be altered if the jn’oper conclusion were that the taking- over of the vessels amounted to a sequestration of them. The act authorizing their seizure did not confer power on the Court of Claims to entertain the present suit, nor does its general jurisdiction extend to suits of this kind. It was said in Hay craft's case, supra: “ It is for Congress. not the courts, to determine whether this jurisdiction shall be extended and other remedies provided.”
The demurrer should be sustained. And it is so ordered.
Gkaham, Judge; Hat, Judge; DowNey, Judge, and Booth, Judge, concur.