## Case No. 15,049.

### UNITED STATES v. EL TELEGRAFO.

[Newb. 383.] [1]

District Court, E. D. Louisiana. Dec., 1846.

PRIZE—RESIDENCE IN ENEMY COUNTRY—ENEMY FLAG—NEUTRAL OWNERSHIP—FURTHER PROOF —EXAMINATION IN PREPARATORIO.

1. A person residing in the enemy country long enough to acquire a domicil there, is subjected to all the disabilities of an enemy, so far as it relates to his property.

2. A vessel sailing under the flag of the enemy, is considered as enemy property, and is liable to confiscation jure belli.

3. Upon the breaking out of war between the United States and the republic of Mexico, the province or department of Yucatan, belonging to Mexico, having assumed a flag of her own, and having manifested a determination to remain neutral, a special order was issued by the president of the United States, exempting her citizens from the operation of the laws of war. Under such circumstances no citizen or resident of Yucatan, could with impunity violate her neutrality by assuming, for the purposes of trade, the flag of the enemy.

4. It is a principle of the law of prize, as recognized by the supreme court of the United States (The Nereide, 9 Cranch [13 U. S.] 388), that the two maxims of "free ships, free goods," and "enemy ships, enemy goods," are not necessarily connected. The primitive law, independently of international compact, rests on the simple principle, that war gives a right to capture the goods of an enemy, but gives no right to capture the goods of a friend. The neutral flag constitutes no protection to an enemy's property, and the belligerent flag communicates no hostile character to neutral property.

5. From the foregoing principle, it follows, that a distinction may be drawn between the vessel sailing under the flag of the enemy and her cargo belonging to a neutral; but if it appear that the neutral has by his residence in the enemy country, acquired a domicil there, his property will be considered as enemy property.

6. The court will refuse an application for further proof, where the claim and test affidavit of the claimant are utterly at variance with his answers to the standing interrogatories.

7. The greatest solemnity is attached to examinations in preparatorio. The standing interrogatories are of a searching character, and well calculated to elicit truth and detect fraud; and the reasons must be cogent indeed, that would induce the court to deviate from the established practice, and permit a claimant by further proof, to contradict his own declarations, made under the solemnity of an oath, touching a fact so important as domicil or national character.

In admiralty.

Mr. Durant, U. S. Dist. Atty.
Clarke & Stewart, for captors.
Mr. Soule, for claimant.

McCALEB, District Judge. The vessel containing the property which is now the subject of contest, was captured by the United States steamship Mississippi, under the command of Commodore Perry, on the 21st of October last, about thirty-five miles from the bar of the Tobasco river. She was taken as enemy property and as such con-

1 [Reported by John S. Newberry, Esq.]

demned by a judgment of this court, as prize of war to the captors. A claim has been entered for the cargo by one Antonio Gual, who declares himself the owner of everything found on board, except a few articles of little value which were the property of the master. I will briefly advert to the evidence upon which the condemnation of the vessel was pronounced, and then proceed to inquire how far I am permitted to draw a distinction in favor of the cargo.

The deposition of the master in answer to the standing interrogatories, shows that the schooner "sailed under Mexican colors and had none other on board. He was appointed to the command of the vessel by John Graham, at Campeachy, on the 2d of October last; Graham was owner of the vessel when she was seized; the deponent knows this because Graham told him so; the said owner is an Englishman, and is a brother-in-law of Mr. McGregor, the American consul at Campeachy; he resides with his family in Campeachy, but deponent does not know how long he has resided there; nor does he know how long said owner has been in possession of the vessel, nor from whom he purchased her. He thinks the said owner came from England to Campeachy, and that he is an English subject." In answer to the thirty-second interrogatory, the deponent declares that "as to the property of the Telegrafo," she stands in the name of Alexandro Perez, who is a Mexican citizen, but really belongs to John Graham, who being an Englishman, cannot hold her in his own name. The deposition of Antonio Gual, the claimant of the cargo, shows that a commercial house in Campeachy, composed of John Graham and Jose Calome, is the owner of the Telegrafo, though she stands in the name of some other person whose name deponent cannot recollect. He knows that the persons here named were the owners, by documents which he has seen. The said owners were born, the former in England, and the latter in Campeachy. They now reside in Campeachy. Deponent never knew of them in any other place; they have been in possession of the vessel a long time; they purchased her from one Ramirez; the only sale he knows of, is that from Ramirez to Graham & Calome. He does not know what was the consideration of the sale, nor whether the same was paid, nor any security given. He thinks that said bill of sale transferred the vessel to an individual whose name is unknown to the deponent, but that Graham & Calome are, and were the true owners. He believes that the vessel, if restored, will belong to Graham & Calome, and none others. The certificate of John F. McGregor, styling himself United States consul at Campeachy, shows that "the Mexican schooner Telegrafo is owned by Don Alexandro Perez, a citizen of Campeachy." The papers of the schooner show her to be a vessel of the

department of Yucatan, in the republic of Mexico.

I have not considered it necessary to determine whether the ownership of the vessel be in Graham & Calome, or in Perez, the Mexican citizen; for whether it be in the one or the other, the evidence shows enough to authorize a condemnation. If this question were important, I should undoubtedly feel myself bound by the register or bill of sale which fixes the ownership in Perez. But the residence of Graham & Calome, the latter being a citizen of Campeachy, places them in the situation of enemies. Whatever exemption from the laws of war might be pleaded in favor of Yucatan vessels, it is clear that the conduct of the owners has not been such as to authorize the court to draw any distinction between them and other citizens of Mexico residing in any other part of the republic. It has been proved before this court, that Yucatan had a flag of her own. Had this vessel been found sailing under it at the time of her capture, there would be some ground for supposing that the owners were adhering to that state of neutrality, which the executive department of the government was led to believe would be observed by Yucatan, and which was, on the breaking out of the war, declared in a circular of the secretary of the treasury, to be the ground of extending to the ports of that country, privileges which, by the laws of war, were necessarily forbidden to the other ports of the republic of Mexico. But the concurrent testimony of the master and crew shows that she sailed under Mexican colors, and had no other colors on board; thus openly claiming the protection of the flag of the enemy, and boldly setting at defiance the American squadron now blockading the ports of Mexico. The conduct of this vessel can be regarded in no other light, than as an open and flagrant violation of the very condition upon which our government extended the privileges to which I have alluded, to the ports of Yucatan; and may be regarded as among the many instances of bad faith on the part of citizens of that particular department, which prompted the executive department of our government to revoke the order contained in the circular of the secretary of the treasury, and to place her in the same attitude occupied by other portions of Mexico. The facts of the case thus presented, are not such as to authorize me to regard the vessel in any other light than as enemy property, and therefore liable to condemnation.

I will now consider the claim which has been asserted to the cargo. It is a well settled principle of the law of prize, as recognized by the supreme court of the United States, in the case of The Nereide, 9 Cranch [13 U. S.] 388, that the two maxims of free ships, free goods, and enemy ships, enemy goods, are not necessarily connected. "The primitive law," says Mr. Wheaton (Interna-

tional Law, 480), "independently of international compact, rests on the simple principle that war gives a right to capture the goods of an enemy, but gives no right to capture the goods of a friend. The neutral flag constitutes no protection to an enemy's property, and the belligerent flag communicates no hostile character to neutral property." Let us then inquire how far the national character of the claimant in this case, as established by the evidence, will authorize the court to consider the cargo as neutral property. In answer to the standing interrogatories, the claimant himself declares, that "he was born in Spain. For the last seven years he has lived in Campeachy. He now lives in Campeachy, and has lived there twenty years. He belongs to the Yucatan government, originally belonged to Spain. He is not married. His brother and nephews live in Campeachy." It is unnecessary to look beyond his own declaration, for evidence to establish his national character, or such a domicil in the enemy's country, as will authorize the court to invest him with a national character, different from that which attached to the place of his birth. The claimant, by his own showing, though born a Spaniard, has, by his long residence in the enemy's country, acquired a domicil, which, by the laws of war, and for all the purposes of this libel, subject him to all the disabilities of an enemy. By his own showing, he was, at the time of the shipment of the cargo, fully cognizant of the fraudulent design on the part of those whom he considered the real owners of the vessel, to conceal their ownership by a simulated sale to an individual whose name he did not recollect, but which is proven by the master to be Perez, a Mexican citizen. And whether the property of the vessel was really in Perez, or in Graham and Calome, he knew or was bound to know, that the birth place of one of the partners, and the acquired domicil of the other, invested both of them with the character of enemies, and consequently was fully aware when he sailed with his cargo on the Telegrafo, he was sailing in an enemy's vessel. We have, then, here presented a case of an enemy shipper, embarking with his property on board of an enemy vessel. "In general, and unless under special circumstances," says Mr. Wheaton (International Law, 390), "the character of ships depends on the material character of the owner as ascertained by his domicil; but if a vessel is navigating under the flag and pass of a foreign country, she is to be considered as bearing the national character of the country under whose flag she sails; she makes a part of its navigation, and is in every respect liable to be considered as a vessel of the country; for ships have a peculiar character impressed upon them by the special nature of their documents, and are always held to the character with which they are so invested, to the ex-

clusion of any claims of interest which persons resident in neutral countries, may actually have in them. But where the cargo is laden on board in time of peace, and documented as foreign property in the same manner with the ship, with the view of avoiding alien duties, the sailing under the foreign flag and pass, is not held conclusive as to the cargo. A distinction is made between the ship, which is held bound by the character imposed upon it by the authority of the government, from which all the documents issue, and the goods, whose character has no such dependence upon the authority of the state. In time of war, a more strict principle may be necessary; but where the transaction takes place in peace, and without any expectation of war, the cargo is not to be involved in the condemnation of the vessel, which, under these circumstances, is considered as incorporated into the navigation of that country whose flag and pass she bears."

It is unnecessary to apply the principle sustained by this high authority, with the same strictness therein required, to justify a condemnation of this cargo. It is clearly shown to be the property of the enemy shipped in time of war on board of an enemy vessel, sailing under the enemy flag. I shall not stop to inquire whether there may not hereafter be a reason for the equitable interposition of the executive to be drawn from the fact, that at the date of the capture, the order contained in the circular from the treasury department, exempting the ports of Yucatan from the laws of war, remained unrevoked. For under the circumstances of this case, I consider it immaterial whether the order of the executive thus issued through the secretary of the treasury, was revoked or not, at the date of the capture; since, by the very terms of that order it is clear, that the strict neutrality on the part of Yucatan, which was the condition upon which it was granted, was disregarded alike by the owners of the vessel and the owner of the cargo. They have placed their property under the protection of the flag of the enemy, and sailed for an enemy port. The vessel and cargo are, in my judgment, so included in this transaction, that it is difficult to perceive upon what ground any distinction can be drawn. The order of the president cannot be construed into a sanction of the double dealing of which the parties in this case have been guilty. That order is recognized as the rule by which this court will be governed; but as its effect was to relax the stringent principles of the laws of war, it should be strictly construed and confined to the object it was intended to accomplish. In adopting so liberal and humane a policy towards Yucatan, it certainly was never the design of the president, that citizens and residents of that country, should be allowed to abandon the neutral and appropriate flag of their particular department, and assume that of the enemy; nor could it have

been his design to restrain the prize courts of this country, from inquiring how far the acts of those citizens and residents conformed to that state of neutrality and friendship towards the United States, in which the circular of the secretary of the treasury, expresses the hope they will remain. The questions which naturally and necessarily arise, are neutrality or no neutrality, hostility or no hostility; and the court cannot determine such questions without a free and unrestricted inquiry into the facts developed by the evidence. In the peculiar position occupied by Yucatan, it was the duty of her citizens, and those residing within her jurisdiction, to observe extraordinary caution in their commercial intercourse with other nations; and yet we see them, as in the case before us, openly assuming the garb of enemies, for the purpose of gaining access to the ports of the enemy. The conduct of the owners of this vessel and her cargo, presents to the view of the court a discordia rerum totally irreconcilable with a friendly or neutral attitude. They cannot be permitted at one and the same time, to plead before the prize tribunals of this country, an exemption from the general operation of the laws of war, under an order from the executive of our government, and before the tribunals of Mexico, an exemption from the operation of the same laws, by showing that they sailed under the Mexican flag. The very motive which prompted them to assume that flag, was doubtless to avoid the difficulty and inconvenience which might result from the maintenance of a separate and independent national character.

But the proctors for this claimant have strenuously contended that he is not a resident of the enemy's country, and has never acquired a domicil there; but that, on the contrary, he is a subject of the queen of Spain, and a resident of Havana. In support of this position they adduce his own test affidavit, and his affidavit subsequently made, alleging that he was misunderstood by the prize commissioner when he gave his answers to the standing interrogatories. It is difficult to believe that such a total misapprehension could have existed on the part of both the prize commissioner and the sworn interpreter of the court, when it appears by the certificate of the former, "that the witness having declared that he could not speak the English language, and that the Spanish was his vernacular, the oath was administered, questions propounded, and answers received, and afterwards read over to him in the latter language, through Edward Lanne, a sworn interpreter." To the plain and simple questions, "Where were you born? where have you resided for the last seven years? where do you now live and how long have you lived there?" he has answered, "that he was born in Spain, for the last seven years has lived in Campeachy, and has lived there twenty years; he belongs to the Yucatan government—originally belonged to Spain." In his test affidavit and claim he alleges that he is a subject of the queen of Spain, a native of Catalonia, in Spain, and a resident of the city of Havana, in the island of Cuba, one of the colonies of Spain. In his claim he further alleges, that for the last seven years he has been a resident of Havana, and that only occasionally, and in the fair and honest prosecution of his commercial dealings and transactions, has he visited the ports of Yucatan, of Mexico and of the United States; in neither of which ports he ever fixed his residence, but preserved his residence in Havana, as aforesaid, from which he started on his commercial undertakings. Upon being informed by his proctors of the conflict between his answers to the standing interrogatories and the facts relating to his residence, as stated in his test affidavit and claim, he presented another affidavit, declaring, not that he misunderstood the questions propounded to him in the Spanish language by the interpreter, but that the interpreter must have misunderstood his answers. With every disposition to extend indulgence to a party whenever there is a fair ground for supposing that any misunderstanding or mistake may have arisen, I cannot reconcile such an indulgence with a faithful discharge of my duty in the present instance. It is extremely improbable that any such misunderstanding on the part of the claimant existed. There is no similarity in the sound of the names of Campeachy and Havana which will justify the belief that the interpreter could have mistaken the latter for the former. This fact, alone, would be sufficient to induce the court to reject the subsequent affidavits, without looking to other parts of his answers to the standing interrogatories, which state facts so totally at variance with those which it is now alleged were intended to be stated. And yet the learned proctors have, notwithstanding these glaring inconsistencies in the oaths of their client, urged upon the court the propriety of granting an order for further proof, to enable him to establish a residence in Havana. Whatever may be the strength of the conviction of the honesty of this claimant, which has animated the efforts of his proctors (whose sincerity I cannot for a moment question), I do not feel myself at liberty to take the same benevolent and charitable views of the motives by which he is actuated In the language of Mr. Justice Johnson, in the case of The Rapid, 8 Cranch [12 U. S.] 164: "It is the unenvied province of the court to be directed by the head and not the heart. In deciding upon principles that must define the rights and duties of the citizen, and direct the future decisions of justice, no latitude is left for the exercise of feeling." Temptations to fraud in cases of this nature are many and strong, but it is the duty of a court of prize to exact the utmost fairness on the part of both captors and claimants, and to frown upon every attempt at deception.

The fact that the claim is in opposition to the examination in preparatorio, would alone

be a sufficient ground for the rejection of the claim. "The claim, too, of Mr. Tappan," says Mr. Justice Story, in the case of The Diana [Case No. 3,876], "was in total opposition to all the papers and preparatory examination. Now, I take the general rule to be, that no claim shall be admitted in opposition to the depositions and the ship's papers. It is not an inflexible rule, for it admits of exceptions; but, on examination, it will be found that those exceptions stand upon very particular grounds, in cases occurring in time of peace, or at the very commencement of war, and granted as a special indulgence. But in times of known war, to admit claims in opposition to all the preparatory evidence and papers, to enable parties to assume the enemy's garb for one purpose and throw it off for another, would be holding out an invitation to frauds, and subject the court to endless impositions. The rule can never be relaxed to such an extent without prostrating the whole law of prize." "On the whole, I am entirely satisfied that the claim of Mr. Tappan, standing, as it does, in direct opposition to all the papers and preparatory examinations, ought, even if he had been a neutral, to have been rejected in limine."

The greatest solemnity is generally attached to the examination in preparatorio. The standing interrogatories are searching in their character, and well calculated to elicit truth and detect fraud, and the reasons must be far more cogent than those here advanced, to induce me, in the present instance, to deviate from the beaten track and allow the claimant, by further proof, to contradict his own declarations made under the solemnity of an oath, touching a fact so important as domicil or national character. I shall, therefore, refuse the application for further proof, reject the claim of Antonio Gual, and condemn the cargo of the Telegrafo as prize of war to the captors. The register is hereby ordered to enter a formal decree of condemnation.