AMERICAN EXCH. NAT. BANK v. PALMER, Alien Property Custodian, et al.

(District Court, S. D. New York. March 5, 1919. On Reargument, May 10, 1919.)

1. INTERPLEADER ⬥⟫11—RIGHTS WHICH MAY BE SUBJECT OF INTERPLEADER—TRADING WITH THE ENEMY ACT.

An American bank, indebted to a depositor, an American citizen, which has been served with notice by the Alien Property Custodian that the deposit is the property of an alien enemy and required to pay the indebtedness to the custodian, where the depositor also claims it, may maintain a bill of interpleader in a federal District Court against the depositor and the custodian to have their respective rights determined.

2. WAR ⬥⟫12—TRADING WITH THE ENEMY—"PROPERTY."

The word "property," as used in Trading with the Enemy Act Oct. 6, 1917, § 7c (Comp. St. 1918, § 3115½d), requiring money or property owing by, on account of, on behalf of, or for the benefit of enemies to be conveyed or paid over to the Alien Property Custodian, refers to a tangible res, or some evidence of debt, or share in property.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Property.]

3. WAR ⬥⟫12—TRADING WITH THE ENEMY—"MONEY."

Where the relation of bank depositor and bank exists, an ordinary deposit is not "money," within Trading with the Enemy Act Oct. 6, 1917, § 7c (Comp. St. 1918, § 3115½d), requiring money or property owing by, on account of, on behalf of, or for the benefit of enemies to be conveyed or paid over to the Alien Property Custodian.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Money.]

In Equity. Bill by the American Exchange National Bank against A. Mitchell Palmer, Alien Property Custodian, and John Simon. On motion to dismiss bill. Denied.

White & Case, of New York City (J. Du Pratt White and Robert Forsyth Little, both of New York City, of counsel), for plaintiff.

Francis G. Caffey, U. S. Atty., of New York City (Earl B. Barnes, Asst. U. S. Atty., of New York City, of counsel), for defendant Palmer.

Bigelow & Wise, of New York City (Ernest A. Bigelow, of New York City, of counsel), for defendant Simon.

MAYER, District Judge. This is a motion by defendant Palmer, Alien Property Custodian (hereinafter referred to as the Custodian), for an order dismissing the complaint herein—

"upon the ground of insufficiency of fact to constitute a valid cause of action in equity, it being manifest therefrom that the fund mentioned in the bill of complaint has not passed into the possession of the defendant as Alien Property Custodian, and that the complainant has not taken the jurisdictional steps provided in section 9 of the Trading with the Enemy Act, approved October 6, 1917, as amended."

The complaint alleges:

"(a) That the defendant Simon deposited with the complainant bank, hereinafter referred to as the bank, certain sums of money, and by reason of such deposits the bank is now indebted to Simon in the sum of $358,830.86.

⬥⟫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"(b) That the Custodian has informed the bank of his determination, made after an alleged investigation, that said 'sum of money is owing, belonging to, and held for, by, on account of and on behalf of and for the benefit of Heinrick Frederick Albert (an enemy).'

"(c) That by reason of such determination the Custodian has required of the bank that it 'convey, transfer, assign, deliver, and pay over' said sum to the Custodian.

"(d) That defendant Simon has warned the bank that, if it complies with the Custodian's demand (requirement), said defendant will nevertheless look to the bank for the payment to him of said debt, and he has called upon the bank to resist the demand (requirement), which he has termed to be unwarranted."

The complaint alleges the bank's freedom from any collusion with either of the defendants and contains the bank's offer to pay the amount of its debt into this court, to the end that the defendant lawfully entitled may receive payment. The bank has filed with the complaint the usual affidavit that it has not colluded with either defendant.

Defendant Simon has appeared and filed an answer, which in substance admits the allegations of the complaint, asserts title to the bank's indebtedness, and prays that this court interplead the defendants, so that their adverse demands and their rights in respect of said indebtedness owing by the bank may be judicially settled and decreed. The custodian has appeared generally in the action.

[1] The first question is whether a bill of interpleader will lie. From the pleadings as thus far developed there is no doubt that the bill is brought in good faith, in a sincere desire on the part of plaintiff, an American banking institution, to protect itself in its rights. The plaintiff bank is in this position: If payment is made to the Custodian, the bank must stand suit of Simon to recover his deposit, and in such an action Simon will prevail if the bank fails to establish the validity of the demand as made by the Custodian, his power to make such demand, and the validity of the acquittance received by the bank on paying over the amount of the Simon deposit.

On the other hand, if payment is made to Simon, the officers of the plaintiff bank run the risk of fine and imprisonment for disobeying the Custodian's demand. In such circumstances, the bank is in a parlous position.

The case is well within the principles set forth by Chancellor Kent in Richards v. Salter, 6 John. Ch. (N. Y.) 445, and not at all like Bartlett v. His Imperial Majesty the Sultan (C. C.) 23 Fed. 257. The broad principles of interpleader (although in a case arising under the New York Code) are briefly stated by Mr. Justice Hatch in Helene v. Corn Exchange Bank, 96 App. Div. at page 395, 89 N. Y. Supp. at page 312:

"The moving party is required to show that two persons have preferred a claim against him, that the defendant has no beneficial interest in the thing claimed, and cannot determine without hazard to itself to whom the debt should be paid, and that there is no collusion with any party to the action."

It is unnecessary to cite or analyze other cases on this point mentioned in the briefs in opposition to the motion.

In considering the relations of the parties, it may be pointed out, at the outset, that the Custodian is in error in regarding the amount here

in controversy as a "fund." The bank has not in its hands a fund, as that term is understood in law. The bank is a debtor, and its depositor is a creditor, and, in the event of some action or proceeding involving insolvency, the depositor would be a general creditor, sharing pro rata with others similarly situated. It could not, in such circumstances, obtain the precise amount on deposit, because that amount has not been earmarked, segregated, or in any manner specifically set aside.

The Custodian, in his demand, determined that the deposit was a "special deposit." The complaint, whose allegations must be accepted, shows, however, that the deposit was not in any way a "special" deposit, in the sense of a trust, or a segregated or earmarked fund.

All that Simon has, as against the bank, is a chose in action, and the enemy could at best have no more, if he had the right to stand in the place of Simon. The state of facts in Salamandra Ins. Co. v. New York Life Ins. & Trust Co. (D. C.) 254 Fed. 852, was quite different. In that case the court proceeded on the theory that there was a fund—in other words, a res—segregated for certain purposes.

Bearing in mind the facts in the case at bar, the question, for the purposes of this case, can be disposed of within narrow limits, and without any necessity of questioning the constitutionality of the act in any particular. It may be assumed, for the purpose of the argument, that, if Simon had in his possession property belonging to an enemy, the Custodian could take the steps provided for by the statute to bring that property into his (the Custodian's) possession; but that is not the situation. It is sought here by ex parte proceedings to compel an American citizen to pay a debt claimed by the Custodian to be owing to an enemy by that American citizen, notwithstanding that another American citizen claims that the debt is owing to him.

The question then is whether, under the Trading with the Enemy Act (Act Oct. 6, 1917, c. 106, 40 Stat. 411 [Comp. St. 1918, §§ 3115½a–3115½j]), it is provided, in a case such as this, that the mere investigation and determination of the executive that a debt is owing to an enemy, instead of to a citizen, is sufficient.

The broad general purposes of the Trading with the Enemy Act included the prohibition of commercial relations, except in some circumstances under executive license, and the capture and custody of enemy property, so as to prevent the advantage which would come to the enemy of using such resources. In order to carry out the extremely important purposes of the act, rendered necessary by the exigencies of war, the statute has devised a series of steps by which, in the first place, enemy property is laid hold of, and, secondly, then administered. Congress apparently held the view that a preliminary "hearing" would not be practicable; but, to safeguard against acts which in law might be arbitrary, an "investigation" was preliminarily required. In the effort to protect those who, in one form or another, transferred property to the Custodian, Congress included certain provisions intended to safeguard the persons so transferring property to the Custodian. The language of the statute seems to have been carefully selected, with a view, on the one hand, of being comprehensive as to subject-matter, and, on the other, of being particular as to de-

tails of execution. It is provided, under section 7c (section 3115½d) of the act as follows:

"(c) If the President shall so require, any money or other property owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of an enemy or ally of enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing or so belongs or is so held, shall be conveyed, transferred, assigned, delivered, or paid over to the alien property custodian."

[2, 3] The question here presented is whether the language, "any money or other property owing * * * by, on account of, or on behalf of, or for the benefit of an enemy, * * *" covers a debt such as the bank here owes. Such a debt is not "property" in the ordinary acceptation of the term. A debt may possibly be designated as property in the sense of the assets of an estate or of a creditor, but as used in this section of the act the word "property" undoubtedly refers to a tangible res, or some evidence of debt, or share in property such, perhaps, as, on the one hand, a note or bill of exchange, and, on the other hand, a certificate of stock or an undivided interest in real property. "Money" undoubtedly, under some circumstances, would have a very broad meaning, but, under this section of the act, whatever else might come under the definition of money, it is plain that, where the relation of bank depositor and bank exists, an ordinary deposit is not money within the meaning of section 7c. That this is not a narrow view may be illustrated by reference to subdivision "d" of section 7, where the phrase "any money or other property" is also used, but is followed by the words "or to whom any obligation or form of liability to such enemy * * * is presented for payment." In other words, if money or other property includes such a debt as that in the case at bar, why use the additional language set forth in section 7, subdivision "d"?

But the reason for concluding that the bank deposit cannot be summarily disposed of goes deeper than a mere collocation of words. Let us start with a case of unliquidated damage. The Custodian in his investigation finds, let us assume, that citizen A, prior to the war, breached his contract for delivery of goods to enemy B. Enemy B had a cause of action against citizen A for damages and would have been entitled to a recovery. Can it be imagined that Congress, disregarding constitutional safeguards, would have empowered the Custodian to determine without a hearing that citizen A owed enemy B $1,000 because, after investigation, the Custodian regarded that amount as representing the damage to which enemy B would have been entitled as against citizen A?

Let us go a step further, and assume that citizen A had made and delivered his note to enemy B, but insisted that there were defenses to the note, and that he did not owe the sum represented by the note, and was not liable upon the note. Could the Custodian determine, without a hearing, that there was liability from citizen A to enemy B upon the note, and therefore that there was either money or property owing from citizen A to enemy B?

Wherein does the case at bar differ in principle from these illustrations? As between the Custodian and the bank, the Custodian has

assumed to decide the legal liability of the bank; while the amount on deposit is not in dispute, the very vital question as to who the creditor is still remains in controversy. Was it ever intended, in such circumstances, that the ex parte investigation of the Custodian could determine, as against a stranger to the investigation, that that stranger owed enemy B instead of citizen A?

It may be assumed (without deciding) that, as between the Custodian and Simon, section 7c is applicable; but that section does not contain any language which compels a debtor to pay his debt, without a decree of a court of competent jurisdiction. The United States is protected because other provisions of the act prevent the payment by a debtor to the enemy under pain of punishment, and the omission of the word "debt," or some similar expression, in section 7c is manifestly deliberate; for Congress surely never intended that an American citizen should be put in a position where, because of ex parte determination, he might be called upon to pay his debt twice.

The Custodian's certificate required to be given under subdivision "c" of section 7 would not afford the bank any protection; for that certificate is merely designed, under the act, as an acquittance, if the debt owing and paid is to an enemy. The certificate would not avail the bank as against Simon.

Section 9 (section 3115½e) is not applicable. This section was intended to cover and include property the title to which was in an enemy, and which had been transferred or paid to the Custodian, either voluntarily or following a requirement. It is the citizen's right in enemy's property in the Custodian's hands that is being considered. It is to prevent placing enemy property beyond the reach of American citizens or nonenemies, who may have a right or an interest in or a lien upon the property of an enemy in the Custodian's possession.

The section was not intended to include nonenemies owning property in the United States in which no enemy had an interest, and which therefore was not required to be reported or transferred to the Custodian. It is difficult to suppose that Congress intended that our citizens should divest themselves of title to their own property, give to it an enemy character, and then get it back under section 9.

Realizing that it was impossible to foresee all the questions and contingencies which would arise under the act, Congress confided to the United States courts powers of a most comprehensive character in section 17 (section 3115½i), which reads as follows:

"That the District Courts of the United States are hereby given jurisdiction to make and enter * * * all such orders and decrees, and to issue such process as may be necessary and proper in the premises to enforce the provisions of this act, with a right of appeal from the final order or decree of such court as provided in sections one hundred and twenty-eight and two hundred and thirty-eight of the act of March third, nineteen hundred and eleven, entitled 'An act to codify, revise, and amend the laws relating to the judiciary.'"

Under this section, this court no doubt could have made a formal rule to cover procedure in just such a case as this, and what can be done by rule obviously can be done by decree. If on facts of the character set forth in this complaint, procedure by bill of interplead-

er is sanctioned, the purposes of the statute are satisfied, and the rights of American citizens safeguarded.

It is suggested in the brief submitted on behalf of the Custodian that the Trading with the Enemy Act—

"is not only to weaken the arm of the enemy by depriving him of resources, but also to strengthen the arm of the captor by furnishing means for the prosecution of the war."

Nowhere in the act is there evidence of any legislative intent that the purpose of seizing or taking enemy property under the act is to furnish our government with means to prosecute the war. The final disposition of such property as has been or will be taken under the act will be governed by treaty arrangements or congressional legis- lation or both. In a broad sense, the United States is a trustee to hold enemy property taken under the act, until such time as the Unit- ed States, in orderly course, shall determine the final disposition there- of. It is fair to assume that any treaty will safeguard the rights of American citizens whose property has been seized in enemy countries, and therefore that the provisions of such treaty will, in this respect, be reciprocal. Undoubtedly resources captured under this act could, as an incident, be used by the United States in the course of its pros- ecution of the war; but the fundamental purpose of the act was to prevent the enemy from having the advantage of such resources as might be susceptible of capture under the act.

The amount on deposit with the plaintiff bank is in every sense cap- tured. The bank seeks to deposit that amount in court, where it can- not be withdrawn without an appropriate decree of a court of compe- tent jurisdiction. If the court should find that the deposit is enemy- owned, then the amount representing that deposit can never reach the enemy. If the court, on the other hand, should find that the de- posit belongs to defendant Simon, an American citizen, the situation will be that Simon, nevertheless, cannot have this fund pending a final decree, and thus the United States will be protected against this resource reaching the enemy.

Finally, by the present procedure, the rights of the plaintiff bank would be fully protected, and a simple litigation would be the means of safeguarding the rights of all concerned. In view of the subject- matter of the litigation, and, to the end that a speedy disposition there- of may be had, a motion to advance on the calendar will be entertained, if counsel are so advised.

The motion to dismiss the bill is denied, and there may be submitted an interlocutory decree directing the payment of the amount of the bank's indebtedness into this court, and providing that upon such payment plaintiff shall be discharged from liability either to defendant Simon or to the Custodian.

## On Reargument.

On reargument the counsel for the Alien Property Custodian calls attention to two points claimed not to have been argued before this court:

1. The proposition is made that this suit is, in effect, against the United States, and will not lie. This point, it is true, was not argued.

2. It is also stated, because the amendment of November 4, 1918, to subdivision "c" of section 7 of the Trading with the Enemy Act was not mentioned in the opinion, that the reasoning in the opinion of the court might have been different, and therefore that some expressions of the court went further than the section as amended justified.

Whether some of the reasons set forth in the opinion were sound or not on the legal status in this case as to the debt of the bank considered in this case, I have no doubt my conclusion was right, and my decision so far as concerns this case covered all questions which were or might have been presented.

So far as expressions isolated from context are concerned, counsel of course are at liberty to make any arguments they may be advised in other litigations between different parties.