## KAHN v. GARVAN, Alien Property Custodian, et al.

### (District Court, S. D. New York. April 13, 1920.)

1. WAR ⬤⟳12—ALIEN PROPERTY CUSTODIAN, TAKING OVER ENEMY'S RIGHTS UNDER TRUST, MUST SUBMIT TO ACCOUNTING BY TRUSTEE.

Where the Alien Property Custodian demanded a transfer, by one holding securities in trust for enemies, of the right, title, and interest of the enemies, and did not assert a legal right to the securities themselves, the capture did not change the character of the enemies' right, and if such right was subject to an accounting, the custodian must submit to some judicial determination between himself and the trustee.

2. WAR ⬤⟳12—ALIEN PROPERTY CUSTODIAN MAY COMPEL ACCOUNTING FOR TRUST FUNDS.

The Alien Property Custodian, having taken over the rights of enemies in securities held in trust, may file a bill to compel an accounting upon showing that the period for distribution has arrived.

3. WAR ⬤⟳12—ALIEN PROPERTY CUSTODIAN MAY MAINTAIN SUIT TO REDUCE PROPERTY TO POSSESSION.

Under Trading with the Enemy Act, § 17 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½i), conferring jurisdiction on the District Courts to enforce the provisions of such act, the Alien Property Custodian may begin such ancillary proceedings as are necessary to reduce to possession property taken over by him.

4. WAR ⬤⟳12—ENEMIES' TRUSTEE MAY SUE ALIEN PROPERTY CUSTODIAN FOR ACCOUNTING AND INSTRUCTIONS.

One holding securities in trust for enemies, whose rights have been taken over by the Alien Property Custodian, may sue the Custodian in the United States District Court for a settlement of his accounts and instructions.

5. WAR ☞12—ENEMIES' TRUSTEE CANNOT SUE ALIEN PROPERTY CUSTODIAN FOR ACCOUNTING WITHOUT RECOGNIZING HIS TITLE.

One holding securities in trust for enemies, whose rights have been taken over by the Alien Property Custodian, cannot sue the Custodian for an accounting, without recognizing the title of the Custodian, and, where he disputes such title, the bill will be dismissed.

6. WAR ☞12—EQUITABLE INTERESTS IN TRUST FUND SUBJECT TO CAPTURE.

Under Trading with the Enemy Act, § 7 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d) subds. (a), (c), and (d), the equitable interests of enemies in a trust fund in personal property may be captured.

7. WAR ☞12—NOTICE TO ENEMIES' TRUSTEE BY ALIEN PROPERTY CUSTODIAN SUFFICIENT, THOUGH SIGNED BY A SUBORDINATE.

A demand on a trustee, holding property in trust for enemies, for a transfer of their rights, titles, and interest to the Alien Property Custodian, was sufficient, though signed by a subordinate, under an executive order authorizing him to delegate his power.

8. WAR ☞12—STATUTE DECLARING RESIDENTS OF GERMANY ENEMIES, REGARDLESS OF CITIZENSHIP, IS VALID.

The provision of Trading with the Enemy Act, § 2 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa) subd. (a), declaring residents of, Germany enemies, regardless of their citizenship, was within the powers of Congress.

9. INTERPLEADER ☞8(1)—VOID CLAIMS WILL NOT SUPPORT BILL.

It is not enough to support a bill of interpleader that baseless claims are made against the stakeholder, and, if they are void on their face, the bill will not lie.

10. WAR ☞12—INTERPLEADER WILL NOT LIE AGAINST CUSTODIAN AND ENEMIES ON BEHALF OF TRUSTEE.

A bill of interpleader cannot be maintained by one holding securities in trust for enemies, a transfer of whose rights has been demanded by the Alien Property Custodian, against the aliens and the Custodian, as it is the intention of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j) that the decision of the Custodian shall be conclusive and that no remedies, except under section 9, shall exist.

11. WAR ☞12—TRADING WITH THE ENEMY ACT NOT INVALID FOR LACK OF PROVISION FOR REMEDY IN COURT.

The Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j) is constitutional, though it provides no remedy for a review of the acts of the Alien Property Custodian in taking over property, except by suit under section 9, authorizing suits by claimants within six months after the conclusion of peace.

In Equity. Suit by Arthur A. Kahn, individually and as trustee under a deed of trust executed by Hirsch Kahn—September 23, 1908, against Francis F. Garvan, as Alien Property Custodian, and others. On motion by the Alien Property Custodian to dismiss the bill for want of equity. Bill dismissed, unless plaintiff amends.

Motion by the Alien Property Custodian to dismiss a bill in equity brought in this court for want of equity under the following circumstances: The plaintiff is a citizen of the United States, residing in the Southern district of New York, and substituted trustee under a deed of trust of his deceased father. He lays the equity of the bill under two headings: First, that as trustee he is entitled in this court to file a bill for the usual trustee's accounting against beneficiaries; and, second, that the bill is in the nature of a bill of interpleader.

The facts alleged in the bill are as follows: One Hirsch Kahn (the plaintiff's father), a citizen of the United States then residing in Germany, on September 23, 1906, executed a deed of trust to his brother, Louis Kahn, also a citizen,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

then residing in New York. This deed conveyed certain personal property in the form of investment securities, the details of which it is not necessary to state, upon trust that, during the life of the said Hirsch Kahn, the trustee should pay over the income of the security, "if, when, and as I may give him [the trustee] notice that I desire the same," with remainder to his wife, Ida Kahn; in case of her survival, upon the same terms. Upon the grantor's death the trustee was to pay to his two daughters, Recha Blumenfeld and Bella Lowenthal, or their heirs, the sum of $12,000 each, and if his third daughter, Selma, should marry before such time, to pay her so much of $47,800 as in his judgment he might think fit. The deed further provided that upon Hirsch Kahn's death the trustee should pay to his son Arthur A. Kahn (the plaintiff), in trust for his son Julius, the sum of $50,000 for his maintenance and support, with remainders over on Julius' death to Arthur and his daughters per stirpes. Upon the death of the survivor of Hirsch Kahn and his wife, Ida, the trustee was to divide the residue of the fund between the four children, Arthur, Recha, Bella, and Selma, per stirpes. There was provision for the substitution of trustees, the sale and purchase of securities, and other incidental matters of administration.

Louis Kahn, the grantee, accepted the instrument on September 23, 1908, and continued to act until the death of Hirsch Kahn in Germany on February 22, 1914, whereupon he resigned, and the plaintiff was appointed substituted trustee on May 22, 1914. The three daughters have married German subjects, as follows: Recha in 1904, Bella in 1902, Selma in 1912—and have always resided in Germany. The plaintiff has received statements (which he asserts are not sufficient to justify any action) that Ida Kahn died on or about April 8, 1917.

On the 20th day of May, 1918, the Alien Property Custodian served the defendant with three several notices under section 7 (c) of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d) and sections 2(a) and 2(c) of the Executive Order of February 26, 1918. These were all alike, and recited that after investigation the Custodian had determined that each of the three sisters was an enemy, that each had a certain right, title, and interest under the deed of trust before mentioned, and that he, as Alien Property Custodian, required that every such right, title, and interest in the said trust be conveyed, transferred, assigned, delivered, and paid over to him as such, to be by him administered and accounted for as provided by law. This notice was signed "A. Mitchell Palmer, Alien Property Custodian, by J. L. Davis, Managing Director."

The plaintiff alleges that the three daughters, through duly authorized attorneys, have asserted to him that the demands so made were illegal; that they were not enemies in fact; that there is no legal evidence of the death of the complainant's mother; that he has no authority under the deed to compel a distribution of the fund; and that the demand of the Alien Property Custodian was violative of their rights under the Constitution of the United States, the treaties with Germany, and the laws of nations. He further alleges that he was advised of no hearing held by the Custodian, and that the alleged capture is in violation of the Constitution; that he had objected to the validity of the claims of the Custodian, and had attempted to settle his differences with him, including the payment of certain taxes levied by the state of New York, and the valuation and terms of distribution of the trust, and other incidents arising in the discharge of his duty as such substituted trustee, but that he had been unable to come to an agreement, and that some judicial settlement of his duties and his accounts was essential; that for this reason he joined the Custodian and the three daughters, together with a bank which held some of the securities under conditions not necessary to set forth.

Joseph M. Proskauer, of New York City, for plaintiff.

Spier Whitaker, of Washington, D. C., for defendant Alien Property Custodian.

Max J. Kohler, of New York City, for defendants Blumenfeld, Lowenthal, and Steinhard.

LEARNED HAND, District Judge (after stating the facts as above). The bill has two aspects: (1) As a trustee's bill, asking an accounting; (2) as a bill in the nature of a bill of interpleader. If it had enough equity under the first aspect, the motion to dismiss the whole bill must be denied, regardless of the second. For the moment, therefore, I may assume, without deciding, that it will not lie as a bill for interpleader, because the daughters have no standing in the court at all, and the property had been lawfully captured.

[1] Upon these assumptions, it is necessary briefly to consider the nature of the "right, title, and interest" which was the subject of the putative capture. It did not profess to be greater than the right of the enemies as cestuis que trustent, and it did not in law change the substance, or the incidents, of the right itself, any more than if, for example, it had been an unliquidated claim for breach of contract. Nor, indeed, could the Alien Property Custodian under such a demand, or unless he asserted a legal right to the securities themselves, by capture change the character of the enemy's right as obligee. If it be a chose in action, subject to an accounting as a condition of its assertion, he must submit to some judicial determination between himself, as captor, and the trustee as obligor. Such a demand neither enlarges nor contracts the rights seized.

[2] If so, the Alien Property Custodian, as cestui que· trust, might pursue against the trustee all the remedies which the enemy might have pursued, if an alien friend. Among such rights is a bill to compel an accounting upon showing that the period had arrived for distribution, and as a condition of reducing the right to possession. Conversely, the trustee has the right, before distributing the res, to file a bill for a voluntary statement and settlement of his accounts (Mildeberger v. Franklin, 130 App. Div. 860, 115 N. Y. Supp. 903), so that he may get a valid discharge and close up the estate. Such a right is as much an incident to the right of the cestui que trust as his own substantive right to compel a distribution after such an accounting.

[3, 4] If so, the first question here is simply one of the jurisdiction of this court under section 17 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½i). It is now settled that under that section the Alien Property Custodian may himself begin such ancillary proceedings as may be necessary to reduce the res to possession. Garvan v. $25,000 Mortgage Bonds, 265 Fed. 477, —— C. C. A. ——. He could similarly have brought a bill for an accounting in this court under this deed of trust. May not the trustee conversely have resort to this court? In Keppelmann v. Keppelmann, 108 Atl. 432, the Court of Errors of New Jersey entertained such a bill filed by a trustee asking for instructions, and advised him that he should distribute the res to the Alien Property Custodian as cestui que trust. The trustee might perhaps file this bill in the New York courts, have his accounts stated, and get binding instructions; but it does not follow that he may not file a bill here as well. Section 17 confers on this court general jurisdiction "to enforce the provisions of" the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), and if this be a suit ancillary to that purpose the jurisdiction extends so far. While it is

not a bill by the Alien Property Custodian to enforce his rights under the act, a judicial accounting is, as I said, a condition upon its orderly execution, because without it the trustee cannot be compelled to distribute. I think it makes no difference, this being its substantial purpose, who is plaintiff or who is defendant.

The Alien Property Custodian urges that the case of Garvan v. $25,-000 Mortgage Bonds, supra, is to the contrary. I think not. There he had determined that he was entitled, not to whatever rights as cestuis que trustent the German insurance companies had, but to the very corpus of the res. The court decided that the investigation and decision of the Alien Property Custodian was conclusive, and that the capture went as far as it purported to go, and required delivery of possession, under rule 2 (c). Had the Alien Property Custodian in this case demanded, as he most properly did not do, out of the hands of the plaintiff, the securities themselves, a question would arise, similar to that in Garvan v. $25,000 Mortgage Bonds, supra, and Salamandra, etc., Co. v. N. Y. Life Ins. & Trust Co. (D. C.) 254 Fed. 852, whether any inquiry whatever was justiciable into the validity of the conclusion of the Alien Property Custodian, or whether there was any remedy at all except by suit brought under section 9. In the case at bar all he claimed was the acknowledged rights of enemies, and these were, as I have said, conditional upon some such proceeding as is here instituted.

[5] For these reasons the motion to dismiss the whole bill would have to be denied, except for one other objection, which is that the bill denies that the Alien Property Custodian is in fact the cestui que trust and disputes his title. Now it is not of course a condition upon the usual bill of a trustee for an accounting that he should attempt to decide between rival claimants who is the lawful cestui que trust. Rather he may interplead them all so long as he acknowledges the validity of the trust by virtue of which alone he comes into court. But the jurisdiction of this court under section 17 is limited to suits to enforce the provisions of the act, and if in fact, as I shall show, the controversy which the trustee interjects into this suit is not a controversy justiciable in any court whatever, the bill cannot be held to fall within section 17, since it is not ancillary to the purposes of the act, but introduces a controversy which no court may entertain, save under section 9. Therefore the bill will lie only in the event that it recognize the title of the Alien Property Custodian and ask for a settlement with him as cestui que trust, merely as a necessary preliminary to distribution of the res. Therefore the motion must be granted as the bill stands, though the plaintiff may save it by amending so as to recognize the title by capture of the Alien Property Custodian.

The second point next arises, of the equity of the bill as a quasi interpleader. If it be true that the plaintiff has no possible ground to fear the claims of the enemy cestuis que trustent, and if, moreover, they are expressly forbidden by valid enactment from bringing any suit in any court against him, the ground of interpleader disappears. It is apparent that the practicable administration of a statute drawn for the purpose of capturing and sequestering enemy property in time of war would be at an end, if any bailee or trustee might interplead

263 F.—58

other claimants, whether enemies or friends. Such a statute presupposes the immediate reduction to possession of the captured funds, and the interposition of such litigation would in effect destroy the possibility of its summary execution. Garvan v. $25,000 Mortgage Bonds, supra.

That the purpose of the act was the contrary admits, I think, of no question. Section 9 gave a right of action in the District Court to all claimants within 6 months after the conclusion of peace and conferred full jurisdiction on that court to declare the respective interests in the fund and to decree payment. As the capture is in no sense a condemnation, but merely a sequestration, section 9 furnishes complete relief to all who come within its terms, except for the necessary interruption of their possession, and the possible loss arising from conversion of the property into cash by sale, an incident which does not arise in this case. The interruption to possession, or to the right to immediate possession, was a necessary incident in practice to such a system, which was itself short of the actual war powers of the nation. Miller v. U. S., 11 Wall. 268, 20 L. Ed. 135. It has not, so far as I can learn, ever been questioned in any court. Salamandra, etc., Co. v. N. Y. Life Ins., etc., Co. (D. C.) 254 Fed. 852; Garvan v. $25,000 Mortgage Bonds, supra; Keppelmann v. Keppelmann, supra.

But section 9, having created this remedy, concludes with a paragraph which makes all captured property immune from process in any court, and thus cuts off any remedy in rem or in personam. Moreover, as a necessary corollary, section 7 (e) provides immunity in personam to any person who shall comply with any demand of the Alien Property Custodian. The language of the section it is not necessary to give in extenso; it provides in the most explicit way for the complete protection in every court of the bailee, trustee, agent, obligor, or other person called upon to yield to the Alien Property Custodian's symbolic act of capture.

[6] This being the scheme of the act, there are but two grounds upon which a bill of interpleader might conceivably rest: (1) That the capture was not within the scope of the act; (2) that the statute is void. Ignoring the more fundamental question whether this court has jurisdiction in any case to entertain such a bill under section 17, I think that neither ground is good. There can be not the least doubt that the capture was within the act, because section 7 (a), third paragraph, and section 7 (c), and section 7 (d) all very clearly include equitable interests in any kind of property. The language of 7 (c) and 7 (d) is as follows:

"Property * * * held for * * * or on behalf of or for the benefit of" an enemy.

The third paragraph of 7 (a) includes all kinds of trusts, and is not limited by the language of the first paragraph:

"Trustees * * * issuing shares or certificates representing beneficial interests."

The general terms were used to include all kinds of property, and it is scarcely likely that so common a form as trusts should have been excluded. Section 8 (a) covers only property held as security.

[7, 8] The only other points which can be raised as to the capture are that the demand was not signed by the Alien Property Custodian personally and that the daughters were not enemies. As to the first, it is covered by section 3 (a) of the Executive Order of February 26, 1918, unless that be invalid. That section authorized a delegation by the President to the Alien Property Custodian of his own power to delegate, and it is, of course, inconceivable that such an officer should not have the power to distribute his duties among his subordinates. The duty is executive, not judicial (Runkle v. U. S., 122 U. S. 543, 7 Sup. Ct. 1141, 30 L. Ed. 1167), not even the preliminary investigation, which concludes no one, and is without force in a suit under section 9. That the daughters were enemies appears from the allegations of the bill that they resided in Germany; as such they are enemies, regardless of their citizenship. Section 2 (a). It has been the general doctrine that citizens domiciled in enemy territory do by the rules of international law take on the status of enemies. The Francis, 9 Fed. Cas. 673, No. 5,034, affirmed 8 Cranch, 363, 3 L. Ed. 590; The Venus, 8 Cranch, 253, 3 L. Ed. 553; U. S. v. El Telegrafo, 25 Fed. Cas. 1008, No. 13,049 (semble); The Venice, 2 Wall. 258, 275, 17 L. Ed. 866.

In some of these cases it is mentioned as one element that the citizen was not only domiciled in enemy territory, but a merchant whose goods were being used in enemy trade. I do not understand that this was a deciding factor in determining his status, but of the validity of the capture; the cases being in prize. The crucial question is whether the citizen has taken steps to return; some overt act being necessary. The Venus, supra. If actually constrained from return, perhaps the question is open. The Peterhoff, 5 Wall. 28, 60, 18 L. Ed. 564. But, however that may be, it was open to Congress under its war powers to declare the status of all citizens actually present in enemy territory, certainly in a statute like this, because, however blameless of any share in hostile acts, their property, if reduced to possession where they reside, by hypothesis falls within the power of the enemy government for such purposes as it may choose. Here we have in question, not the condemnation of enemy property, but its sequestration; the final purpose of Congress being not yet disclosed. Section 12. How far citizens who can show themselves constrained against return may claim the rights of friends under section 9 is not before me. That Congress might capture and sequester their property during war seems to me open to no doubt whatever.

[9, 10] Thus it appears that the claims of the codefendants are without substance in law, and it is not enough in a bill of interpleader that baseless claims should be made against the stakeholder; they must not be void on their face, or the bill will not lie. Bassett v. Leslie, 123 N. Y. 396, 25 N. E. 386; Pusey & Jones Co. v. Miller (C. C.) 61 Fed. 401. But the vice of the bill is deeper, because the plan of the act is that, so far as concerns capture, the decision of the Alien Property Custodian shall be conclusive, and there shall be no remedies whatever, except under section 9. Doubtless, if the Custodian, exceeding his powers, seized property not covered by the act, or without any demand, he would be guilty of trespass, and could be sued individually; but

the res seized by color of his office would be captured and sequestered, and no process would run against it, or against any one who delivered it to him because of that delivery. Garvan v. $25,000 Mortgage Bonds, supra; Salamandra, etc., Co. v. N. Y. Life Ins., etc., Co., supra.

Thus, even if the questions raised were in enough doubt of themselves to justify a bill of interpleader, none such could lie here. The act intends the immediate reduction to possession of all property which the Custodian shall decide to be enemy property; all questions arising from his mistakes, or even from his oppressive or arbitrary action, are relegated to suits under section 9. By the capture nothing is condemned, nothing confiscated, nothing concluded. The citizen runs only the risk of temporary dispossession through the misprision of the officials; not always a light matter it is true, but a necessary incident of war. To entangle this power in incidental litigations would be substantially to deny its value, which depends upon its speedy and absolute exercise. Therefore the plaintiff has complete protection in section 7 (e), and there is no ground for an interpleader.

[11] There remains only the question of the constitutionality of the act, about which I shall say little. As between the Custodian and citizens, section 9 is enough, for the reasons I have given; so far as they may suffer injury, which that section does not meet, it is a loss that cannot be cured without undue impediment to the national power. As between enemies and the Custodian, if in fact enemies, they are subject to the exercise of that power without any legal limitations. Up to the present time in any case it has not been exercised to the full extent of confiscation, as might have been done. Miller v. U. S., 11 Wall. 268, 20 L. Ed. 135. It is urged, however, that under McVeigh v. U. S., 11 Wall. 259, 20 L. Ed. 80, they are constitutionally entitled to a hearing, and that this is the only one possible, since section 9 does not cover them. The effect of that decision has been misunderstood; it proceeded upon the ground that the claimant in a proceeding in rem had under the statute a right to appear. No one can question that necessity under that statute, since only by appearance could the claimant show that his goods were not forfeit.

But the Trading with the Enemy Act provides an adequate remedy in section 9 to those who can maintain that they are not enemies, and who can therefore have any rights to object to the capture; under the Civil War Confiscation Act, its equivalent was included in the claimant's right to appear and contest condemnation. It is, indeed, a question whether, after peace is declared, a former enemy, then an alien friend, might not bring a suit under section 9, at least as amended on July 11, 1919; but I do not press that point. My reliance is upon the fact that it covers all who do not come in the avowed status of enemies, and that those who do can have no rights arising from capture. Theoretically it may be possible to conceive of cases, though I have not been able to imagine any, of avowed enemies who might still protest on the ground, as I have already suggested, that the property captured was not within the act, or that the formalities of capture were not observed.

Such supposed protests can arise, I think, only from too narrow an understanding of the scope of the act, and leave the rights denied to enemies too tenuous to impose any constitutional limitation on the powers of Congress. The purpose was to accomplish a swift, certain, and final reduction to possession of vast quantities of property involved in incredible complication of ownership and interest. That purpose could be accomplished only at the sacrifice of much that custom had made sacred; with its propriety courts have nothing to do; they may only learn what it was, and consider whether the constitutional limitations were observed. In the latter consideration it is legitimate to remember that any initial hearing of an enemy would have been a fatuous procedural requirement in practice. That the statute is invalid, because there was no eventual equivalent, seems to me a contention which subjects the nation's powers to unreal and scholastic limitation.

Therefore the bill is without equity as a bill of interpleader. It is quite true that American Exchange Nat. Bank v. Palmer (D. C.) 256 Fed. 680, is not in accord with my reasoning here; but that case differs from this on the facts, because the only codefendant was a citizen, while here they are all enemies. There is no reason whatever to suppose that, had the codefendant there been an enemy, the result would have been different from this. As to the reasoning which I have adopted, it has seemed to me that the language of the Circuit Court of Appeals in Garvan v. $25,000 Mortgage Bonds, supra, which is necessarily authoritative upon me, has given wider scope to the powers of the Alien Property Custodian than was thought to exist in American, etc., Bank v. Palmer, supra, or than is consistent with the maintenance of this bill. I am therefore compelled to yield my assent to that construction of the statute.

The bill will be dismissed, with costs, unless within 20 days the plaintiff shall amend by striking out the defendants other than the Alien Property Custodian and the bank, and by recognizing the Custodian as a cestui que trust under the deed.